HERBERT E. LOCKHART, et al.,
Libelants
v.
THE WESTERN STAR, et al.,
Respondents

U. S. No. 192 - 1949

District Court of the Virgin Islands

Div. of St. Thomas and St. John at
Charlotte Amalie

July 12, 1950

MOORE, *Judge*

STATEMENT OF FACTS

The Court finds the facts in this case to be as follows:

On the morning of August 24, 1949, the vessel, "WESTERN STAR," a vessel in excess of one hundred tons, was anchored in the harbor of Saint Thomas, at which time and place there was a threatened hurricane in the area. The captain went aboard at twelve midnight of August 23, 1949, at which time there was no gale, and after checking with the mate and considering the weather safe, he went to bed.

Some time in the morning of August 24, 1949, between three and six a.m., the captain of the vessel was awakened by the anchor watch to find that, in a gale of around forty miles an hour which had then arisen, the vessel was dragging anchor and drifting toward shore. According to the testimony of the captain, he called the mate and other members of the crew. They then attempted to start her engines, but could not do so in time to turn her out to sea as, in the meantime, her anchor broke. Upon finding that she had drifted in too far to be then turned out to sea and that she was about to ram another ship, the captain elected and succeeded in steering clear of the other ship and, having then made the decision, ran her bow head on into the sand beach next to the plaintiff's wharf. Her stern then listed over towards plaintiff's wharf. The sea was very choppy and, in order to sustain as little damage as possible to his ship and to protect his ship, he then tied her up to the plaintiff's wharf. The constant pulling of the ship against this small wharf, because of high rough seas and until it could be removed next morning, partially destroyed the wharf. Plaintiff's attorney then made claim to the captain of the ship for damage to the wharf. The captain told him that the ship's owner had informed him that the ship was

168

insured by Lloyd's Insurance Company and that he had been instructed by the owner that in any eventuality he must get in touch immediately with the nearest Lloyd's agent. Thereupon, both the plaintiff's attorney and the captain of the ship went to see the West Indian Company, the Lloyd's agent in St. Thomas. Consultations then went on for several days between the plaintiff's attorney, the captain of the ship, and the Lloyd's agent in St. Thomas. The plaintiff's survey of the damage was in the amount of $3,211.65. The survey of Lloyd's was in the amount of $2,381.50. The captain agreed to sign an acknowledgment of responsibility and an agreement to settle upon the basis of the Lloyd's survey, provided the ship was allowed to proceed. Plaintiff's attorney insisted on the amount of his survey, but after many further conferences, finally accepted the figures of Lloyd's and the captain in the sum of an even $2,400.00. The ship's captain then insisted that he would not sign an acknowledgment of responsibility on the basis of any negligent operation of his ship, but would sign upon the basis of an "unauthorized mooring" which he chose to make for the benefit of his own ship. The parties then finally agreed upon $240.00 as the amount of loss to the plaintiff for non-use of the wharf while being repaired or a total settlement of $2,640.00. Whereupon, the captain of the ship, in the presence of, and with the approval of, the Lloyd's agent in St. Thomas, signed an acknowledgment of responsibility based upon an "unauthorized mooring," and an agreement on behalf of himself and his principal to pay to the plaintiff the sum of $2,640.00 as compensation therefor. The captain, however, as a prerequisite to signing the said agreement, exacted a "gentlemen's agreement" from plaintiff's attorney not to libel or delay the ship's voyage upon his, the captain's, assurance that his principal would remit the money immediately. Thereafter, the captain cabled

his principal to remit $3,000.00 to St. Thomas. The Western Star then sailed from St. Thomas on September 1, and did not return until October 10. The money had not been received from the owner of the ship, and the captain told plaintiff's attorney that the owner was having trouble with his insurance. It then developed that the owner had made a mistake in telling the captain that the ship was insured with Lloyd's, and that, in fact, it was with another company, which had repudiated liability upon the grounds that they had not been consulted as the policy specified, and that they might have had a defense, which had now been waived. The owner then repudiated the agreement on the grounds that the agreement was beyond the scope of the captain's authority, and on October 13, this libel suit was filed against the Western Star, her engines, etc., and Leonard C. Barnes, owner, and Richard G. Stafford, master. The complaint was later amended to include a count in tort for negligent operation in failing to keep her engines going and warm in the face of a threatened hurricane, an unauthorized mooring, as well as a count upon the agreement. The evidence was taken on December 1, 1949. On February 21, 1950, the owner posted bond in the sum of $3,200.00 and the ship was released.

OPINION

 Without the necessity of going into the question of whether under all of the surrounding circumstances Captain Stafford was negligent in going to bed at twelve midnight when he went aboard without taking further precautions than he did, it seems very clear that when he awoke and found his ship in a precarious position, his decisions were all for the benefit of his ship. That when he finally tied her up to the plaintiff's wharf, he realized that his ship was worth many times the value of the wharf, and according to his own testimony, he de-

liberately and intentionally so tied her there to save the ship as much damage as possible. "In case of emergency, it is the right of the Master to direct the stranding of the vessel in an attempt to save the ship and cargo without consulting with the officers or crew as to the propriety of so doing." 48 Am. Jur. 85 Columbian Ins. Co. v. Ashby, 13 Pet. 331, 10 L. Ed. 186. He realized in so doing that any damage to the wharf would be small in comparison to the damage his ship might sustain if he did not. Clearly, the ship and its owner would be responsible for such damage. For a vessel as well as its owner are liable for its torts: 24 R.C.L. 1201, 93 U.S. 99, 23 L. Ed. 819; 145 U.S. 335, 36 L. Ed. 727.

 It is also a well settled principle of admiralty law that the master of a ship may do whatever is clearly necessary for the safety of his ship and the success of his voyage. It is equally clear that admiralty law also allows the master to even sell the ship where necessary if the need is clear and all diligence is used. 48 Am. Jur. 94-5 and cases cited.

 Therefore, to keep his ship from being delayed by libel and to insure the continuance and success of his voyage the master had a clear duty to dispose of this claim against his ship in the manner he did for the acknowledged and undisputed "unauthorized mooring," especially where he exercised the diligence shown here, to wit: he consulted Lloyd's as his principal instructed him to do. He refused to accept any survey but theirs, saving his principal $600.00 in so doing. He refused to sign without the approval of Lloyd's agent. He signed only in their presence. And he then extracted an agreement allowing him to proceed on his voyage. It is clearly not the plaintiff's responsibility that the defendant ship owner made a mistake in advising his captain wrongly as to the insurance company which actually carried the policy on the ship.

171

■ The Court is, therefore, of the opinion that the Western Star and/or its owner, Leonard C. Barnes, and/or its captain, Richard G. Stafford, are liable to the plaintiffs herein. The court is of the further opinion that the agreement made between the parties herein stipulating the damages as $2,640.00 is reasonable and fair and should be the measure of plaintiff's damages.

Order may be drawn in conformity with this opinion.